AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>**ASIM WAQAR**<br>**MINA KUHL**<br>**FARID RAHMAN**<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>)<br>)<br>) |

**FILED**

APR 1 1 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 5, 2005 to August 21, 2008___ in the county of ___Alameda and elsewhere___ in the ___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |



4-11-70393

| | |
|---|---|
| PENALTY: | Imprisonment: 20 years maximum |
| | Fine: $250,000 maximum |
| | Supervised Release: 3 years maximum |
| | Special Assessment: $100 |
| | Restitution |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF THIS COMPLAINT

☑ Continued on the attached sheet.

APPROVED AS TO FORM:

_____
STEPHEN G. CORRIGAN, AUSA

_____
*Complainant's signature*

FBI Special Agent William J. Leoni
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___April 11, 2011___

_____
*Judge's signature*

City and state: ___Oakland, California___

Laurel Beeler, U.S. Magistrate Judge
*Printed name and title*

Document No.

District Court
Criminal Case Processing

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

The undersigned, William J. Leoni, being duly sworn, hereby declares and says:

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since May of 1995. In accordance with my duties as such, I am assigned to investigate violations of federal law occurring in the Northern District of California, including wire fraud, mail fraud, securities fraud, and money laundering. During my career with the FBI, I have primarily investigated violent crime, organized crime/drugs, and white collar crime matters.

2. I am a graduate of the University of Kansas where I earned a Bachelor of Arts degree in 1985 and of the University of Missouri-Kansas City where I earned a Master of Science degree in 1991. In 1995, I successfully completed New Agents' Training at the FBI's training academy at Quantico, Virginia. Since 1999, I have been assigned to a squad responsible for investigating a wide variety of white collar matters, including insurance fraud, wire fraud, and mail fraud matters.

3. This affidavit is offered in support of a Criminal Complaint alleging that beginning no later than March 2005 and continuing to approximately August 2008, Asim WAQAR, Mina KUHL, and Farid RAHMAN engaged in a conspiracy to defraud Kaiser Permanente (KP), an integrated health care consortium based in Oakland, California, by submitting false employee time records for KUHL which resulted in her being paid more than $1,500,000 for services not rendered, in violation of Title 18 U.S.C. § 1349, conspiracy to commit wire fraud and mail fraud; Title 18 U.S.C. § 1341, mail fraud, and Title 18 U.S.C. § 1343, wire fraud.

## STATUTORY AUTHORITY

4. Title 18 U.S.C. § 1349, Conspiracy, states:

"Any person who attempts or conspires to commit any offense under this chapter [Chapter 63- Mail Fraud and Other Fraud Offenses] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

Title 18 U.S.C. § 1341, the mail fraud statute, states:

"Whoever, having devised a scheme or intending to devise any scheme artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or caused to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered any mail or such carrier according to the direction thereon, ...."

Title 18 U.S.C. § 1343, the wire fraud statute, states:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false and fraudulent pretenses... transmits, or causes to be transmitted by means of wire ... in interstate or foreign commerce , any writings, signs, or signals ... for the purpose of executing such schemes or artifices...."

5. The facts and information in this affidavit are based upon my personal knowledge and participation in this investigation and information and reports obtained from investigators and others from KP's National Special Investigations Unit. This affidavit does not include every fact or piece of information that the Government has concerning the possible commission of conspiracy, wire fraud, or mail fraud violations.

## OVERVIEW OF THE FRAUD SCHEME AND INVESTIGATION

6. The FBI initiated the instant investigation on May 7, 2010 based upon a referral received from Senior Investigator Barbara E. Naimark, KP National Special Investigations Unit,

2

Pasadena, California. Beginning in August 2008, Naimark conducted a comprehensive, internal investigation after receiving a complaint from Christopher Lull, Senior Business and Technology Analyst. Lull alleged that his manager, Asim WAQAR, may have been entering and approving excess work hours for Mina KUHL, a contract employee purportedly working on WAQAR'S team since approximately 2005, when in fact KUHL had performed no work on behalf of KP. To Lull's knowledge, no one on the KP Ingenix/ePremis team had ever communicated with, seen, or received any work product from KUHL. Lull informed Gigi Pappas-Medan, WAQAR's supervisor, of his concerns and on August 21, 2008, Pappas-Medan met with and questioned WAQAR about the matter. During this meeting, WAQAR told Pappas-Medan that KUHL worked for and supported Carole Behlke, a person who worked under WAQAR's supervision in Ohio. However, Behlke subsequently confirmed that she did not know KUHL and KUHL did not do any support work for her. Based upon this ongoing investigation, WAQAR was placed on administrative leave and he thereafter resigned from KP on September 4, 2008.

7. The investigation reflects that between March 5, 2005 and August 21, 2008, WAQAR facilitated and approved fraudulent payroll time entries for KUHL, a former consultant/contract employee assigned to the Care Delivery BIO, Ingenix/ePremis Unit. WAQAR used deceit and material misrepresentations to KP managers, employees and contract suppliers/vendors to make it appear as though KUHL was an employee performing work on behalf of KP. The investigation reveals that KUHL never performed any work for KP from 2005 through 2008, the period in which she was paid more than $1.5 million. The investigation further reveals that WAQAR caused KUHL to be hired and later requested that her time as a KP contract employee be extended.

8.  In March 2005, when KUHL was first hired, KP contracted with Ensamble Chimes Workforce ("Chimes"), an external service provider that coordinated the hiring of KP's contract employees on behalf of approved KP Information Technology (IT) vendors.  A review of employee time records submitted by or on behalf of KUHL, and primarily approved by WAQAR, reveals that KUHL purportedly worked for and was paid by three different contract vendors (Technisource, Inc., Diversity MPS, Inc., and ProUnlimited, Inc.) during the referenced time period.  KP paid these three vendors approximately $1,803,667.84 for KUHL's supposed services.  In turn, the contract vendors paid KUHL approximately $1,521,875.00 during this same period.  KUHL'S billing rate was approximately $150.00 per hour while her pay rate was approximately $125.00 per hour.

## SUBJECTS' BACKGROUNDS

9.  Asim WAQAR is a 38-year-old Canadian citizen originally from Pakistan who is believed to be currently residing in Windsor, Ontario, Canada.  He was initially hired by the KP IT Department on July 25, 2001 and was laid off on July 29, 2003.  From July 2004 through April 2006, WAQAR was employed at KP as a Chimes contract employee.  WAQAR was rehired as a full-time KP employee in May 2006 and worked there until his resignation in September 2008.  For the period July 2004 through September 2008, WAQAR managed the KP Ingenix/ePremis Unit at KP's Oakland, California, facility.  WAQAR's KP application documents list a home address in Detroit, Michigan.  WAQAR has no identifiable criminal history.

10.  Mina Zainab KUHL is a 35-year-old United States citizen, born in Afghanistan, and believed to be currently residing in Windsor, Ontario, Canada.  She is married to Farid RAHMAN.  Records reflect that in March 2005, KUHL was hired as a Chimes contract

4

employee to work on KP projects remotely from Michigan. KUHL's resume and application documents submitted to Technisource list KUHL'S home addresses in Westland, Michigan and Garden City, Michigan, both Detroit suburbs. KUHL has no identifiable criminal history.

11. Farid RAHMAN is a 42-year-old male believed to be currently residing in Windsor, Ontario, Canada, with his wife, KUHL. RAHMAN owns and operates RJ International, LLC, doing business as Ruby Jewellers, 27505 Ford Road, Garden City, Michigan. RAHMAN has no identifiable criminal history.

## PRIOR RELATIONSHIPS BETWEEN THE SUBJECTS

12. The investigation reveals that WAQAR, KUHL, and RAHMAN had existing relationships before KUHL began receiving payment from KP in approximately March 2005 as a contract employee. Specifically, the following established connections were noted:

**Common Address**

13. A review of WAQAR's KP personnel file reveals an undated resume which lists a home address of 36741 Spanish Oak Drive, Westland, Michigan. KUHL'S undated resume submitted to Technisource lists the same address. A KP employment offer letter dated July 5, 2001 was sent to WAQAR at this same Spanish Oak Drive address.

14. A National Embark form dated February 28, 2005 also reflects KUHL's home address to be 36741 Spanish Oak Drive, Westland, Michigan.

15. Additionally, results from a query of the ChoicePoint Clear database, citing credit bureau sources, reveals that all three subjects have been associated with the Spanish Oak Drive address: WAQAR, from February 1, 2001 through July 20, 2005; KUHL from December 1, 1995 through October 15, 2005; and RAHMAN from June 1, 2000 through April 24, 2009. The data also

5

shows several vehicles registered to RAHMAN at the referenced address over time and WAQAR's

Michigan driver's license was associated with the address at one time.

**Employment Reference**

16. On WAQAR's KP application for employment dated July 7, 2001, he listed as a

personal reference Farid RAHMAN, President, RJ, Inc., 36741 Spanish Oak Drive, Westland,

Michigan, and stated that he and RAHMAN knew each other through "Business."

**Rahman-Kuhl Marriage**

17. The investigation revealed that RAHMAN and KUHL are married and hold a joint bank

account at Bank One, Detroit, Michigan. On a ProUnlimited employment data sheet, dated January

22, 2008, KUHL listed Farid RAHMAN as the person to notify in case of emergency. On this form,

as well as on federal and state tax withholding documents, and a U.S. passport application dated

August 20, 2009, KUHL listed her home address as 27505 Ford Road, Garden City, Michigan, the

physical address of RAHMAN's business, Ruby Jewellers.

**Waqar's Admissions**

18. On September 8, 2008, WAQAR was interviewed by KP investigators and after initially

denying having known KUHL prior to her KP employment, he acknowledged that he had perhaps

met her on one occasion and that he knew her husband who lived in Michigan with KUHL.

WAQAR explained that his parents lived in Windsor, Canada, and one time while vising them he

ran into KUHL's husband, RAHMAN, with whom he had gone to school. WAQAR told

RAHMAN that if he ever needed a job, he should contact WAQAR. It was after this conversation

that KUHL submitted her resume to WAQAR at KP.

19. During a second interview on November 20, 2008, WAQAR initially denied hiring or

6

facilitating KUHL's hiring but later admitted that he had hired her. During this interview, WAQAR reiterated that KUHL was the wife of a friend from college.

## ANALYSIS OF MINA KUHL'S BILLING DATA

20. In 2001, KP contracted with a vendor management company, Chimes, to coordinate staffing services for KP's information technology (IT) contract employees. Chimes contracted with outside suppliers/vendors to administer staffing services and payroll for the contract employees. Chimes declared bankruptcy in December 2007 and as a result, Kaiser Collaborative Staffing Services (KCSS) was formed and remained the staffing service for KP IT.

21. Resource Program Management (RPM) is a KP web-based software program that allows KP project managers to manage their programs and projects. All KP IT employees and contractors use RPM to enter time sheets for employees and contract employees. Managers are required to approve all employee and contractor time. KP employees and contractors can only obtain access to RPM using their logon identifications and passwords.

22. In April 2006, KP began using the Chimes Time & Expense (CTE) module for time entry as part of a software upgrade. When using the CTE, contract employees entered the number of hours worked into CTE on a weekly basis. In turn, the contract employees' time sheets were forwarded to the their respective hiring managers, who were KP employees, for approval in CTE. Every month, the approved time was then extracted from the Chimes system to create supplier/vendor invoices. KP project managers were required to approve contract employees' work hours in both Chimes and RPM and all the RPM and Chimes data was required to match.

23. During this investigation, both the RPM and Chimes CTE billing data were reviewed

7

and analyzed to determine the number of hours billed by KUHL, the projects on which she
purportedly worked, and the persons who approved her reported work hours. Records reflect
that KUHL's RPM billed hours were approved by WAQAR from March 7, 2005 through August
13, 2005, and from May 28, 2006 through August 15, 2008. Between August 14, 2005, and
May 27, 2006, Ray Poppino, WAQAR's supervisor, approved KUHL's RMP time. Because
WAQAR was a contract employee at the time KUHL was hired and not a full-time KP employee,
he was not supposed to approve her time. According to Poppino, this is likely the reason why
Poppino was directed in August 2005 to approve KUHL's time. Poppino stressed that KUHL
worked directly for WAQAR and although Poppino approved the hours submitted on behalf of
KUHL, Poppino did not interact with her nor did he see any of her work product. Once contract
employees were required to enter time into the Chimes system in April 2006, WAQAR was
listed as the person who approved KUHL's hours.

24. A review of the RPM and CTE billing data revealed that the number of KUHL's
reported work hours greatly exceeded the established 40-hour work week, with a dramatic
increase in 2007 through 2008. Listed below is a chart summarizing by year the number of
KUHL's billed hours:

| YEAR | WEEKS BILLED | TOTAL HOURS BILLED | AVERAGE HOURS PER WEEK |
|------|--------------|--------------------|------------------------|
| 2005 | 42 | 2,533 | 60.30 |
| 2006 | 52 | 3,042 | 58.50 |
| 2007 | 52 | 3,936 | 75.69 |
| 2008 | 34 | 2,664 | 78.35 |

| **Total** | 180 | 12,175 | 67.64 |
|---|---|---|---|

25. It should be noted that for the 13-week period from September 5, 2007 through December 15, 2007, KUHL reportedly worked an extraordinarily high number of hours, including 7 consecutive weeks from September 15, 2007 through November 3, 2007, in which she billed 106 hours per each week.

## COMPUTER FORENSICS ANALYSIS

26. An internal KP computer forensics analysis and e-mail review was performed by KP's Ben Rose including an analysis of WAQAR's and KUHL's Lotus Notes e-mail communications sent via the KP network. The analysis uncovered no evidence of KUHL's activities as a contract employee working for KP, or working in an IT support role. Very few e-mails between WAQAR and KUHL were recovered and these e-mails related solely to time sheets. No communications related to work issues or evidence of work performed were recovered, as one would expect to see in an employee-supervisor relationship. In fact, of the 3,734 e-mails found in WAQAR's inbox, only one message was found sent from KUHL, and WAQAR was merely copied on the e-mail sent to another person. Additionally, only 2 e-mails were located in WAQAR's "sent" folder which were addressed directly to KUHL, and both of these e-mails appear to be "tests" to confirm KUHL's e-mail address. Two locally stored e-mail archives were recovered from WAQAR's desktop computer and a review showed minimal e-mail activity between WAQAR and KUHL, and the subject matter of these messages was limited to mostly time-related issues and nothing substantive related to work performed by KUHL.

27. Rose's analysis of KUHL's KP mailbox found no e-mails addressed directly to her, only broad e-mails addressed to group e-mail addresses.

9

28. As KUHL was purportedly working remotely from Michigan, a review of remote access logs was also performed to determine when KUHL had logged into the KP IT network remotely. After reviewing all remote access logs dating back to 2005, there was no evidence that KUHL successfully logged in remotely.

29. A search of remedy tickets within the internal KP automated computer support system, which includes such things as employee service requests, requests for change, reports of incidents/problems, etc., was conducted and no remedy tickets could be found that were initiated by KUHL.

**Selected Waqar E-mail Communications Demonstrating His Involvement**

30. In a March 8, 2005 e-mail from Marie Cole, ESS Service Management, to WAQAR, Cole advised WAQAR that KUHL had been set up in the Resource Management Program (RPM) and asked WAQAR to provide KUHL with various information, including her user name (mkuhl) and password (niku2000) to allow for immediate time reporting capability. This e-mail reflects that WAQAR had access to KUHL'S user name and password for the RPM system for time keeping purposes, which would allow WAQAR to enter KUHL'S hours on her behalf.

31. In an e-mail dated January 10, 2006 from Jennifer B. Barnes, Chimes Project Analyst, to various KP hiring managers, including WAQAR, Barnes notified WAQAR that KUHL's contracting period was coming to an end and gave him instructions on how to extend KUHL'S employment. In response, on January 18, 2006, WAQAR sent an e-mail to his manager, Ray Poppino, and advised that he needed to extend KUHL to August 7, 2006, *"...as Hawaii has pushed out their deployment dates to June, and we need to manage the implementation 30 days past Go Live."* Based upon WAQAR's request, Poppino approved

10

KUHL's extension the same day.

32. In an e-mail dated March 25, 2008 from WAQAR to Lisa W. Bellotti, KP

Collaborative Staffing Services (KCSS), and Solomon Weingarten, Waqar's former supervisor

and Vice President of KP's National IT program, regarding, *"Tenure Exception Document,"*

WAQAR transmitted two requests for KP IT Contract Policy Exceptions for contract employees

Carole Behlke and Mina KUHL who were about to exceed the 12-month tenure policy for

contract employees. The request form for KUHL stated that she was a Technical Project

Manager Lead that was *"brought on to deploy ePremis to the ROCS and doing most of the grunt*

*work in terms of builds, configurations, and operational tweaks allowing the current 4 ROCS on*

*ePremis to transmit claims to external payers."* WAQAR further stated on the form that KUHL's

skills *"are essential to the completion of these critical tasks and we are requesting an extension*

*to stay until November 30th."* The total cost to extend KUHL's services was represented to be

$185,000 ($147.50 per hour).

33. In an e-mail dated May 5, 2008, from Alya Abdoun, KCSS Operations Manger, to

WAQAR regarding, *"Mina KUHL - April hours confirmation,"* Abdoun asked WAQAR to

confirm KUHL's 400 approved hours for the past month of April. In response, WAQAR wrote,

*"I am at an offsite so will check the image later. But based on the self funded work going on*

*right now (and my memory) that sounds about right."*

## WITNESS INTERVIEWS

34. According to Investigator Naimark, KP investigators interviewed at least 11 KP

employees or contractors who worked in the Ingenix/ePremis Unit during March 2005 to August

2008, the date during which KUHL received pay for allegedly working in that same unit to

11

determine whether KUHL was known to them as a KP contract employee. I have reviewed

summary reports of these interviews and noted that each person interviewed confirmed that he or

she had never met, worked with, or communicated with KUHL. Listed below are summaries of

three of these interviews.

**Interview of Christopher Lull**

35. Christopher Lull, Senior Business & Technology Analyst, KP Care Delivery BIO,

Revenue Cycle Enhancements Department, was interviewed three times, twice in 2008 and

again in 2009, and advised that in July 2006, he began working for WAQAR's team known as the

Ingenix/ePremis Unit as a project coordinator. In approximately January 2008, Lull transferred

to working on budgets, including preparing budget reports for WAQAR's team. In doing so, Lull

noticed that KUHL was billing over 40 hours per week. Lull was concerned about the impact of

KUHL's high number of hours on the budget and the fact that he had never before seen or heard

of KUHL, despite his long tenure in the department. When Lull asked WAQAR about KUHL,

WAQAR told him that KUHL worked for Carole Behlke. WAQAR knew Behlke to be a 40-year

KP employee and so he did not question KUHL's hours thereafter.

36. In June 2008, WAQAR's department was reorganized and Gigi Pappas-Medan

became WAQAR's direct supervisor. As part of the transition, the department had an off-site

meeting in Saratoga Springs, New York, in August 2008. Lull shared a ride with WAQAR and

Behlke from the Albany, New York, airport to Saratoga Springs, New York, and during the ride

WAQAR told Lull and Behlke that he intended to give a PowerPoint presentation to the group

which included an organizational chart showing KUHL working under Behlke. When Behlke

asked who KUHL was, WAQAR responded that she had been working for Robert Goldstein, a

12

former KP Vice President that had recently left the company. Later, Lull asked others in the department if they knew KUHL but no one knew who she was or what work she had performed. Lull reported his concerns to his manager, Pappas-Medan.

**Interview of Gigi Pappas-Medan**

37. On August 26, 2008, Gigi Pappas-Medan, Executive Director, Revenue Cycle & Web Applications, KP IT Care Delivery BIO, was interviewed and advised that in approximately July 2008, she became WAQAR's direct supervisor. In preparation for an off-site meeting in Saratoga Springs, New York, Pappas-Medan directed WAQAR to prepare a PowerPoint presentation containing the structure of his team and its activities. Following the meeting, Christopher Lull reported his concerns about WAQAR and the hours reported by KUHL to Pappas-Medan. Lull told Pappas-Medan that nobody on the team had ever seen KUHL, received e-mails from her, or spoke with her. Lull also told Pappas-Medan about the conversation that WAQAR had had with he and Behlke in the car on the way to Saratoga Springs. Pappas-Medan then confirmed with Behlke that KUHL did not work for her. Under the guise of budget preparations, Pappa-Medan asked WAQAR to provide details to her on the work completed and number of hours worked by members of his team. At the same time, Lull provided her with the identical information. WAQAR complied and Pappas-Medan noted that WAQAR reported fewer hours for KUHL than was reflected in the known, accurate figures provided by Lull.

38. On August 21, 2008, Pappas-Medan met with WAQAR to discuss KUHL'S employment. During the meeting, Pappas-Medan telephoned Behlke and placed the call on speaker phone so that WAQAR could listen. Again, Behlke reiterated that she did not know KUHL and that she never worked for her. Later in the day, WAQAR came to Pappas-Medan and

13

told her, "I have to confess, I have been approving Mina's time. I don't know what she is doing." WAQAR was placed on administrative leave the same day and later resigned from KP on September 4, 2008.

**Interview of Carole Behlke**

39. On September 22, 2008, Carole Behlke, Program Manager, Ingenix/ePremis ROCS, was interviewed and advised that she has worked in the Ingenix/ePremis Unit since January 2004 and was based in Ohio. Behlke reported to WAQAR. Behlke stated that she had three employees that reported to her and she has never met, worked with, or communicated with KUHL. She also confirmed that prior to the offsite meeting in Saratoga Springs, New York, WAQAR told her that he had inserted KUHL's name under Behlke's name on the organizational chart for his team in his PowerPoint presentation to be given to the group. Behlke reported that the only other time she had seen KUHL's name was on a budget document for her region a few years previous and she asked WAQAR about it. WAQAR told her that KUHL was doing work for all of the regions outside of California and Behlke merely asked that KUHL's name be removed from her budget.

40. During the interview with KP investigators, Behlke reviewed the RPM data that showed the projects that KUHL supposedly worked on. Upon review, Behlke confirmed that it would not have been possible for KUHL or anyone else to be doing any work on the Ingenix/ePremis projects without her knowledge given Behlke's close relationships with the business partners in all of the regions.

**Interviews of Waqar's Supervisors**

41. Investigator Naimark advised that five of WAQAR's former managers or supervisors

14

during the time of KUHL's contractor engagement from March 2005 through August 2008 were also interviewed. I have reviewed these interview reports and noted that four of the five interviewees denied knowing, working with, or even communicating with KUHL. The fifth supervisor, Ray Poppino, who was WAQAR's supervisor from approximately 2005 through July 2006, reported that he was familiar with KUHL's name and said she was hired as a contract employee upon the recommendation of WAQAR, who indicated that he knew her from Michigan. Poppino never met KUHL but may have spoken to her and WAQAR on the telephone on one occasion.

## SUBJECT INTERVIEWS OR ATTEMPTED INTERVIEWS

### Asim Waqar

42. On September 8, 2008 and November 20, 2008, WAQAR was interviewed by KP investigators and advised that he has worked for KP on and off since approximately June 2001, first as a contractor and later as a full-time employee (FTE). In approximately 2005, WAQAR became a FTE and worked on the Ingenix/ePremis team, transferring from Pasadena, California to Oakland, California. During his initial interview, WAQAR denied being the hiring manager for KUHL or being involved in her hiring in any way, citing that at the time, he was a consultant and as such, he was not permitted to be involved in the hiring process. WAQAR initially denied knowing KUHL prior to her KP employment but later acknowledged that he had perhaps met her on one occasion and that he knew her husband who lived somewhere in Michigan with KUHL. WAQAR stated that his manager, Ray Poppino, likely hired KUHL. WAQAR advised that when KUHL started her employment in 2005, he actively worked with her and she had assignments on the User Provisioning, Ingenix, and ePremis projects. He also stated that KUHL was a "technical

15

consultant" that looked at applications and recommended solutions. He stated that Carole Behlke needed help in her regions so he assigned KUHL to her and added that he had not worked with KUHL for about one year. He advised that KUHL reported to Behlke and not to him, and initially denied having any communications (e-mail, phone, etc.) with Behlke about KUHL on the day he was called in to speak with his supervisor, Gigi Pappas-Medan. Later in the interview, however, he acknowledged sending a message to Behlke via his Blackberry stating, "Mina works for you" and explained that this related to a "brain dump" or monthly status report. He stated that he did not know why Behlke would say that KUHL did not do work for her but intimated that there may have been "power plays" occurring within KP ever since Vice President Robert Goldstein left. WAQAR acknowledged that he was the person who approved all of the time for his team members, including KUHL. He stated that he had no idea how much time KUHL was billing until Pappas-Medan asked him to research it in August 2008, and he discovered that she was working up to 70-80 hours per week. He stated that he blindly approved everyone's time by just hitting "approve all time" and that he now felt guilty about having approved KUHL's monthly time sheets without proper review.

43.   WAQAR was again interviewed by KP investigators on November 20, 2008 over the telephone. During this interview, WAQAR stated that he wanted to "come clean" with what he did and what he had lied about. He explained that he had not been honest with KP investigators during his initial interview and he promised his wife that he would come clean. WAQAR advised that at the off-site meeting in Saratoga Springs, New York, he told his team that KUHL supported Behlke in the ROCs. He said this was based upon the work Behlke was doing because she was fully funded and he wouldn't have to justify the resources. When Pappas-Medan

16

confronted him he already felt disgraced and acted surprised when Behlke said that KUHL did

not work for her. WAQAR stated that KUHL had really been supporting him in Ingenix/ePremis

for the last few months, and not supporting other regions. He again reiterated that he did not hire

KUHL but when told that documents suggested otherwise, WAQAR admitted that, "I brought her

on." He said that KUHL was the wife of a friend from college and stated that he did not receive

any financial benefit from having KUHL work at KP. When told that there was no indication

that KUHL actually did any work for KP, WAQAR then advised that KUHL had been doing

"system analyst" work for him for the full three years of her employment. He said she did not

access the network and provided him with advice and made recommendations to him. He added,

"I told you I lied. I did set her up" and "I lied where the position was funded. She did work

generally for me."

**Farid Rahman**

44. On November 18, 2008, KP investigators interviewed RAHMAN at his place of

business, Ruby Jewellers, 27505 Ford Road, Garden City, Michigan. He confirmed that he was

married to KUHL and advised that she was currently at their home in Canada. RAHMAN was

asked to telephone KUHL and ask her to come to the Jewelry store but he stated that he could not

reach her and refused to provide contact numbers for KUHL. He added that KUHL no longer

worked for KP.

**Mina Kuhl**

45. On November 18, 2008, KP Investigator Naimark telephonically contacted KUHL

and advised that she wanted to speak with her regarding her work at KP. In response, KUHL

replied numerous times, "I have no interest in Kaiser" and then hung up.

## FINANCIAL ANALYSIS

**Rahman/Kuhn Bank One Account**

46. Documents obtained from ProUnlimited, one of the KP vendors that KUHL purportedly worked for, include a direct deposit application completed by KUHL (and voided check) that requests that KUHL's pay be electronically deposited into Bank One account number XXXXXXXX-8601 (hereafter "8601"). The application lists KUHL's home address as 27505 Ford Road, Garden City, Michigan (physical address of Rudy Jewellers, owned by KUHL's husband, Farid RAHMAN) while the voided check lists her home address as 36741 Spanish Oak Drive, Westland, Michigan.

47. Records acquired from JP Morgan Chase Bank, Detroit, Michigan, reflect that Bank One account 8601 was opened on February 18, 1998 and titled, "F RAHMAN or Mina Z. KUHL. The bank provided a photocopy of one signature card reflecting that RAHMAN was an authorized signer on the account.

48. A further review of the account's bank statements and deposited items reveals that between April 1, 2005 and August 20, 2008, 101 deposits totaling $1,019,399.64 were made into Bank One account 8601 from Kaiser Permanente vendors Technisource ($406,849.89), Chimes/Diversity MSP ($408,132.61), and ProUnlimited ($204,417.14). Of the 101 deposits, 10 were in the form of company checks while the remaining 91 were directly deposited into the account electronically.

**Suspected Payments from Rahman/Kuhl to Waqar**

49. Upon a review of the outgoing checks and wire transfers of funds debited against RAHMAN'S and KUHL:'S Bank One account 8601, there is probable cause to believe

18

that at least $380,000 was paid to WAQAR. Specifically, the following transactions are of note:

50. On December 29, 2005, a wire transfer of funds in the amount of $5,000 was made from account 8601 to Citibank West account number XXXXX-1184 in favor of "Asim WAQAR Imad."

51. Between November 29, 2005 and August 3, 2008, 6 checks totaling $335,000 were written against account 8601. Based upon a review of the financial institution stamp and handwritten account numbers found on the reverse side of these checks, it is believed that the checks were deposited into accounts 400-121-0 and 100-111-4 domiciled at The Royal Bank of Canada (RBC), Ontario, Canada. Five of the checks, totaling $275,000, were made payable to "1241123 Ontario Inc." and 1 check totaling $60,000 listed no payee. In the memo sections of two of these six checks, including the one without a listed payee, appears the handwritten notation, "Asim" while on another, the words "Loan to Asim" is written. I believe these checks were signed by RAHMAN based upon a signature comparison using the account's signature card containing RAHMAN'S known signature.

52. It should be noted that on WAQAR's KP Application for Employment dated July 25, 2001, WAQAR stated that from May 1996 to September 1998, he was employed as a Project Manager for "1124123 ON INC." of Lahore, Pakistan. Also, on a subsequent KP Application for Employment dated January 23, 2006, WAQAR reported that from December 2003 through July 2004, he was employed as a Senior Manager for "124 INC" for the Project Management Institute, Mississauga, Ontario. Both of these listed employers link WAQAR to the payee listed above, "1241123 Ontario Inc."

53. On December 21, 2007, a $40,000 check written against account 8601 was made

payable to Asim WAQAR and deposited into account number XXXXXXX-3884 at The Toronto Dominion Bank, Toronto, Ontario, Canada. I believe this check was signed by Farid RAHMAN, again based upon a signature comparison.

54. Other noteworthy debits from account 8601 include the following: Between August 16, 2007 and September 5, 2008, 8 checks totaling $91,900 were made payable to Mina KUHL and deposited into The Toronto Dominion Bank, 1550 Grand Marais Road West, Windsor, Ontario, account numbers XXXXXX-3220 and XXXXXX-7528. I believe these checks were signed by Mina KUHL based upon a signature comparison using documents containing KUHL's known signature.

55. Between July 8, 2005 and September 27, 2008, 21 checks totaling $289,543 were made payable to Ruby Jewellers and deposited into the company's bank accounts, including Bank One account XXXXXXXX-7996. Records for this account have been obtained and are currently being analyzed.

**Waqar's Citibank Account and Further Connection to "1241123 Ontario Inc."**

56. Records for WAQAR's Citibank account number XXXXXXX-9194 were obtained and analyzed. The records reflect that between September 9, 2006 and April 4, 2008, WAQAR wrote 10 checks against the account, totaling $51,500.00, made payable to "1241123 ONTARIO INC" or "1241123 ON INC." The reverse side of these 10 checks reveals no endorsement but the checks were deposited into two accounts held at the RBC. The checks contain handwritten account numbers "400-121-0" and 100-111-4" on the reverse side, which match the handwritten account numbers on the six checks from RAHMAN and KUHL's 8601 Bank One account referenced above in paragraph 51.

57. It should be noted that a Mutual Legal Assistance Treaty (MLAT) request to obtain the relevant records from the above-referenced Canadian bank accounts has been issued to Canadian authorities and is pending.

## INTERSTATE NEXUS

58. As discussed above, of the 101 payments made to KUHL by three KP vendors, 10 were in the form of corporate checks made payable to Mina KUHL. One check was mailed from Technisource in Saint Louis, Missouri to KUHL at her home in Westland, Michigan, while other checks were mailed from Diversity MSP in Los Angeles, California, and ProUnlimited in Burlingame, California, to Kuhl at RAHMAN's business address in Garden City, Michigan.

59. In addition, bank records reflect that KUHL received 91 electronic payments from KP vendors Technisource, Diversity MSP, and ProUnlimited which were directly deposited into RAHMAN and KUHL's Bank One account domiciled in Detroit, Michigan.

60. On March 23, 2011, Michael J. Chrusch, Senior Counsel, SFN Group, Inc., Ft. Lauderdale, Florida, a company that acquired Technisource, advised that from 2005 through 2007, Technisource utilized two banks to pay its contract employees, including KUHL, namely U.S. Bank of Saint Louis, Missouri and Fleet Capital Bank of Boston, Massachusetts.

61. On March 30, 2011, Suzanne Larsen-Balading, Director, Human Resource Solutions, ProUnlimited, Burlingame, California, advised that in 2008, during the time when ProUnlimited made direct deposits into KUHL's Bank One account (Routing Transit/ABA number 072000326), the source of the payments was ProUnlimited's Citibank account (Routing Transit/ABA number 021000089). Subsequently, I queried the ABA Number Lookup database and determined that ProUnlimited's Citibank Routing Transit/ABA number corresponds with a

Citibank facility located in New Castle, Delaware while KUHL's Bank One's Routing

Transit/ABA number corresponds to a JP Morgan Chase Bank facility located in Tampa, Florida.

## CONCLUSION

62. As set forth above, and based upon all of the facts and circumstances described in

this affidavit in support of a Criminal Complaint, there is probable cause to believe that Asim

WAQAR, Mina KUHL, and Farid RAHMAN engaged in a conspiracy to defraud Kaiser

Permanente by submitting false employee time records for KUHL which resulted in her being

paid for services not rendered, in violation of Title 18 U.S.C. § 1349 (Conspiracy), Title 18

U.S.C. § 1343 (Wire Fraud ), and Title 18 U.S.C. § 1341 (Mail Fraud ). The investigation

revealed that despite no credible evidence that KUHL performed any work for KP based upon the

criminal acts of WAQAR, KUHL, and RAHMAN described above, KP paid 3 vendors

approximately $1.8 million and in turn, the 3 vendors paid KUHL approximately $1.5 million.

Of this $1.5 million, approximately $1 million was deposited into a Bank One account held

jointly by KUHL and RAHMAN, WAQAR's friend from college. From this account, no less

than $380,000 was paid to WAQAR.

63. I respectfully request that the court issue warrants of arrests for WAQAR, KUHL,

and RAHMAN.

//

//

//

//

22

64. Since this investigation is continuing, disclosure of the contents of this affidavit will jeopardize the progress of the investigation. Accordingly, I respectfully request that the Court issue an order to file under seal this affidavit and Criminal Complaint until further order of this Court.

WILLIAM J..LEONI
Special Agent, Federal Bureau of Investigation
San Francisco Division


Subscribed and sworn to before me on this 11 day of April, 2011

LAUREL BEELER
United States Magistrate Judge

23